UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT ANNABEL, II,

                          Plaintiff,              Civil Action No. 20-11114

v.                                                Judith E. Levy
                                                  United States District Judge

SHERMAN CAMPBELL, *et al.*,                       David R. Grand
                                                  United States Magistrate Judge

                          Defendants.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART AND DENY IN PART DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 36)

*Pro se* plaintiff Robert Annabel, II ("Annabel"), who was incarcerated within the

Michigan Department of Corrections ("MDOC") during the relevant time period[1], brings

this civil rights action pursuant to 42 U.S.C. § 1983, against MDOC employees Sherman

Campbell, David Messer, Christina Bates, Stacey Ream, Brian Evers, Richard Russell,

Mark Houser, Arthur Thomas, and Heidi Washington (collectively, "Defendants").  (ECF

No. 1).  An Order of Reference was entered on May 6, 2021, referring all pretrial matters

to the undersigned pursuant to 28 U.S.C. § 636(b).  (ECF No. 23).

On July 13, 2021, Defendants filed a Motion for Partial Summary Judgment on the

Basis of Exhaustion.  (ECF No. 36).  Annabel filed an amended response on August 20,

_____

[1] Annabel was paroled after he commenced this action.  (*See* ECF No. 38).

2021, and Defendants filed a reply on September 23, 2021.  (ECF Nos. 42, 43).[2]

The Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.  *See* E.D. Mich. LR 7.1(f).

## I.      RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion for Partial Summary Judgment **(ECF No. 36)** be **GRANTED IN PART AND DENIED IN PART**.

## II.     REPORT

### A.      Background

### 1.  The Underlying Incidents

Annabel is a recent MDOC parolee who, at all relevant times, was confined at the Gus Harrison Correctional Facility ("ARF") in Adrian, MI.  He brings this § 1983 civil rights action, alleging violations of his rights under the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, *et seq*. ("RLUIPA"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA").

In his operative amended complaint, Annabel alleges a series of events stemming from his assignment to a weekly work detail during the Sabbath by Corrections Program Coordinator Christina Bates ("Bates") in September 2019, which allegedly violated his religion and led to his filing a grievance.  (ECF No. 18, PageID.132-33).  As a result, Annabel asserts that, "in a conspiracy to continue the violations of [his] free exercise

_____

[2] While Annabel's amended response was mailed on August 20, 2021, his filing was not docketed until September 9, 2021.  (8/20/2021 dkt. entry).

rights," Warden Sherman Campbell ("Campbell"), Deputy Warden David Messer ("Messer"), Grievance Coordinator Stacey Ream ("Ream"), Assistant Deputy Warden Brian Evers ("Evers"), Grievance Manager Richard Russell ("Russell"), Sergeant Mark Houser ("Houser"), and Resident Unit Manager Arthur Thomas ("Thomas"), subjected him to a series of retaliatory "harassment and corruption" through "malicious effort[s] to obstruct the grievance process" by "falsely reject[ing]" his grievance and "threaten[ing] to retaliate if [Annabel] continued to file grievances." (*Id.*, PageID.133-35). Annabel further asserts that MDOC Director Heidi Washington ("Washington") upholds an "overbroad" and "vague" prisoner discipline policy that "promote[s] retaliation with impunity," denies "reasonable notice" for discipline, and "disparately impacts prisoners with mental illness behavioral issues." (*Id.*, PageID.137-38).

Specifically, Annabel alleges that his "religion is a form of Christianity that observes the weekly Sabbath [from] sundown Friday to sundown Saturday," during which "no work must be done, nor wages received." (*Id.*, PageID.132). However, in September 2019, Bates allegedly "assigned [Annabel] an on-grounds maintenance work detail" for "Fridays and Saturdays." (*Id.*, PageID.132-33). After several "failed attempts" to "exchange" his scheduled workdays during the Sabbath with his usual days off on "Wednesdays and Thursdays," Annabel "wrote a grievance." (*Id.*, PageID.133). According to Annabel, "[t]here was no legitimate penological interest or even a compelling governmental interest behind denying his request." (*Id.*).

Starting from this point, Annabel allegedly became the target of a "conspiracy to continue the violations of [his] free exercise rights." (*Id.*). He alleges that, in "a malicious

effort to obstruct the grievance process," Ream and Evers "falsely rejected the grievance at Step I" without addressing it "on the merits," even though he "clearly followed the grievance policy." (*Id.*).  Ream and Evers "also threatened to retaliate if [he] continued to file grievances by placing him on Modified Grievance Access for 3 months." (*Id.*, PageID.133-34).

When Annabel appealed "the grievance to Step II," Campbell allegedly "changed the obviously false rejection to a new false rejection for non-grievable issue, claiming that Plaintiff has no religious rights under MDOC policy or the Constitution." (*Id.*, PageID.134).  He then appealed "the grievance to Step III," at which point Russell "upheld the malicious rejection that the issue was non-grievable and that Plaintiff had no religious rights." (*Id.*).  Annabel alleges that, throughout "2019 and 2020," Campbell and Ream "began another campaign of retaliatory harassment by falsely rejecting any grievance alleging unconstitutional conditions, . . . [and] repeatedly threatened Plaintiff with Modified Grievance Access." (*Id.*, PageID.135).

Annabel further alleges that, when "the harassment and corruption continued," he sent a kite to Ream on April 17, 2020, stating, "You are a very corrupt defendant," which he contends was a "true statement of both Campbell and Ream as protected speech." (*Id.*). In response, Ream issued Annabel a "Class II Insolence misconduct charge," violating his "right to criticize her for being corrupt and that such was being litigated." (*Id.*).  Houser reviewed the misconduct ticket on April 20th, but despite Annabel's explanation that the ticket "was retaliation for protected speech, not insolence," Houser failed to "quash the ticket" and instead stated that "Campbell and Ream would write more tickets if he

4

continued to complain or file grievances." (*Id.*, PageID.136).  On April 22nd, Annabel showed the ticket to Evers, who allegedly responded, "We don't give a sh** about your lawsuits.  I would find you guilty, and, yes, we can write you a ticket at any time you file a grievance or a lawsuit," threatened him with "more time in prison," and said that "Campbell disapproves of Plaintiff's protected conduct." (*Id.*).  On April 24th, Thomas held a misconduct hearing and, with "retaliatory motive and intent," found Annabel guilty. (*Id.*).  Annabel then filed "a misconduct appeal," which Campbell "denied [] personally." (*Id.*).

Finally, Annabel alleges that Washington "upholds a policy or custom to never discipline any employee who retaliates" because the definition of "Insolence" under Policy Directive 03.03.105 was so "overbroad" that it included First Amendment "protected conduct," but also so "vague [] that it failed to give him reasonable notice that complaining that an employee was 'a very corrupt defendant' constituted 'Insolence,'" in violation of Fourteenth Amendment due process. (*Id.*, PageID.137).  He also asserts that Washington and Campbell "subjected [him] to cruel and unusual punishment [under the Eighth Amendment] by refusing to authorize a waiver of the Loss of Privileges sanctions he has served since June 2014 despite a period of nearly a year without misconduct (only the retaliatory 'Insolence' charge)," and "violated the ADA with a Prisoner Discipline Policy that disparately impacts mentally ill prisoners while refusing to reasonably accommodate them with sanction waivers for improved behavior." (*Id.*, PageID.139).

Based on the above allegations, Annabel sues the Defendants "in their personal capacities for alleged violations of the Constitution, but in their official capacities for

RLUIPA and ADA claims." (*Id.*, PageID.132).   Specifically, he brings (1) First Amendment free exercise and RLUIPA claims against Campbell, Messer, Bates, Ream, Evers, and Russell; (2) First Amendment retaliation claims against Campbell, Ream, Evers, Houser, and Thomas; (3) First Amendment free speech and Fourteenth Amendment due process claims against Washington; and (4) Eighth Amendment and ADA claims against Washington and Campbell.  (*Id.*, PageID.138-39).   Annabel seeks, among other relief, monetary damages, and injunctive relief to stop being forced to "work or accept wages on the Sabbath days" and to "expunge the 'Insolence' charge" and waive the related sanctions stemming from that charge.  (*Id.*, PageID.139-40).

Defendants now move for partial summary judgment on Annabel's claims against them.  Specifically, Defendants argue that they are entitled to summary judgment on all but one claim of a retaliatory misconduct ticket against Ream, based on Annabel's alleged failure to exhaust administrative remedies before filing this lawsuit.

### B.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most

6

favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

Under the Prison Litigation Reform Act ("PLRA"), a prisoner may not bring an action, "under [§ 1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This "exhaustion" requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into

federal court.  *See Woodford*, 548 U.S. at 89.  The Supreme Court has held that this

"exhaustion requirement requires proper exhaustion." *Id.* at 93.  Proper exhaustion requires

"compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90.  In

determining whether a plaintiff has properly exhausted his claim, the only relevant rules

"are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*,

549 U.S. 199, 200 (2007).  Failure to exhaust is an affirmative defense that must be raised

by a defendant, and on which the defendant bears the burden of proof.  *See id.* at 216; *Does

8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).

In their motion, Defendants "concede that Annabel exhausted claims arising out of

[his] claim that Ream issued him a retaliatory misconduct ticket."  (ECF No. 36,

PageID.198).  But as to Annabel's "remaining claims," Defendants assert that, between the

date of the initial incident in September 2019 and the date of filing his amended complaint

on February 12, 2021, Annabel only "pursued [seven grievances] through Step III." (*Id.*,

PageID.188-90).  Among these seven grievances, Defendants argue that only the following

two were "related to claims raised in [his] lawsuit": ARF-19-10-2470-27Z ("ARF-2470"),

which was rejected as untimely and/or non-grievable; and ARF-19-10-2531-28a ("ARF-

2531"), which was rejected as duplicative of ARF-2470.  (*Id.*, PageID.196, 199). [3]

---

[3] At one point, Defendants assert that "Annabel had pursued four grievances through Step III prior
to filing this lawsuit," but this appears to be an error, as it is inconsistent with the table of
grievances set forth in their motion (ECF No. 36, PageID.189-90), and the attached Step III
Grievance Report (ECF No. 36-3, PageID.218-220), which both indicate that seven grievances
had been fully pursued through Step III during the relevant period.  Their motion also misstates
grievance "ARF-19-10-2470-27Z" as "ARF-19-10-2470-**28a**," but the Step III Grievance Report
and salient grievance documents make clear they are referring to "ARF-19-10-2470-27Z."  (ECF
No. 36, PageID.190,196; ECF No. 36-3, PageID.220, 266-69).

Defendants contend that "Annabel's other [five] Step III grievances did not involve any of the claims alleged in this lawsuit," so his "remaining claims are therefore unexhausted and subject to dismissal."  (*Id.*, PageID.199).

In response, Annabel argues that he "did, in fact, properly exhaust all available administrative remedies" because ARF-2470 was improperly rejected as untimely and non-grievable, and that "Defendants['] motion is hardly forthcoming [], misrepresents MDOC's grievance policy, and misstates the facts."  (ECF No. 42, PageID.333-34).[4]

As an initial matter, Defendants' briefing for summary judgment based on a failure to exhaust all but one retaliatory misconduct ticket claim against Ream is cursory, as they essentially set forth a single argument that the only two relevant grievances exhausted through Step III during the relevant period were rejected on procedural grounds.  Indeed, they make no effort to demonstrate that Annabel's relevant grievances were even ***properly rejected***, instead opting to simply rely on the fact that they were "rejected."  However, the law is clear that a defendant cannot show a failure to exhaust merely by showing a grievance was "rejected."  *See Johannes v. Washington*, No. 14-11691, 2016 WL 1253266, at *6 (E.D. Mich. Mar. 31, 2006) (rejecting an argument that a grievance was unexhausted merely because it was rejected as "duplicative" of a prior grievance, reasoning that "[i]f

---

[4] Defendants assert that "Annabel does not identify the grievance by which he exhausted his claims, [but] he is referring to ARF-2470 []."  (ECF No. 43, PageID.343).  As discussed below, a review of Annabel's amended complaint, response brief, and the salient grievance documents confirms that "the grievance" Annabel references throughout his complaint and filings is ARF-2470, given that it was the grievance he first filed concerning the work detail that triggered the events at issue here, and the only one rejected as untimely at Step I, but then rejected as "not grievable" at Steps II and III.  (ECF No. 36-3, PageID.266-70).

this were the case, a prisoner would be barred from filing suit even if the grievance screener incorrectly rejects his grievance as duplicative.").

While somewhat difficult to decipher, careful review of Annabel's operative amended complaint indicates that he raises the following claims against Defendants: (1) First Amendment free exercise and RLUIPA claims based on his work detail during the Sabbath; (2) First Amendment retaliation claims for filing grievances and/or lawsuits; (3) First Amendment free speech and Fourteenth Amendment due process claims asserting that MDOC Policy Directive 03.03.105, "Prisoner Discipline" (the "Discipline Policy"), was both overbroad and vague as applied to him; (4) ADA claims based on the sanctions he received under the Discipline Policy, which "disparately impacts" him as a mentally-ill prisoner (ECF No. 18, PageID.139); and (5) Eighth Amendment claims based on a refusal to "authorize a waiver of Loss of Privileges sanctions [] despite a period of nearly a year without misconduct (only the retaliatory 'Insolence' charge)" (*Id.*, PageID.138).  For the reasons discussed below, the Court finds that Defendants are entitled to summary judgment on the basis of exhaustion on all but Annabel's First Amendment free exercise and RLUIPA claims, and his claim of a retaliatory misconduct ticket against Ream.

### 1. *First Amendment Free Exercise and RLUIPA Claims*

In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130, entitled "Prisoner/Parolee Grievances" (the "Grievance Policy").[5]  A state prisoner must first complete the process outlined in the Grievance Policy

---

[5] The Defendants attach to their motion a copy of the 2007 version of the Grievance Policy.  (*See* ECF No. 36-2, PageID.206-07) ("effective date 07/09/07").  However, because the events at issue

– including pursuing a grievance "regarding grievable issues" through "all three steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful conduct.  (Grievance Policy, ¶ C).

As for "grievable issues," the Grievance Policy provides that "[g]rievances may be submitted regarding alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant, including alleged violations of this policy and related procedures."  (*Id.* at ¶¶ C, F).  Otherwise, "[a] grievance shall be rejected by the Grievance Coordinator if," in relevant part, "[t]he grievance is filed in an untimely manner" or "raises issues that are duplicative of those raised in another grievance filed by the grievant."  (*Id.* at ¶ J).

As for the three-step process, the Grievance Policy provides that, "[p]rior to submitting a written grievance, the grievant shall attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue []."  (*Id.* at ¶ Q).  If a prisoner cannot resolve his dispute, he "may file a Step I grievance," which "must be filed within five business days after the grievant attempted to resolve the issue with the appropriate staff."  (*Id.*).  "A grievant wishing to advance a grievance must send a completed Prisoner/Parolee Grievance form [] to the Step I Grievance Coordinator designated for the facility or other office being grieved."  (*Id.* at ¶ W).

If the prisoner is dissatisfied with the Step I response, he may submit a grievance

---

in this case began in "September 2019" (ECF 18, PageID.132-33), the 2019 version of the Grievance Policy, which went into effect on "03/18/2019," would have applied.  *See* https://www.michigan.gov/documents/corrections/03_02_130_649677_7.pdf.  Thus, the Court herein cites to the applicable 2019 version of the Grievance Policy (effective date 03/18/2019.).

appeal to the Step II Grievance Coordinator within ten business days after receipt of the Step I response.  (*Id*. at ¶ DD).  If the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id*. at ¶ HH).  A "Business day" is defined as "Monday through Friday, 8:00 to 4:30, excluding State observed holidays."  (*Id.* at ¶ A).  "Grievances and grievance appeals at all steps shall be considered filed on the date received by the Department."  (*Id.* at ¶ T).

> a. Defendants Fail to Show that Annabel's First Amendment Free Exercise and RLUIPA Claims were Not Properly Exhausted Where They Assert Such Claims were Non-Grievable

In their motion, Defendants argue that ARF-2470 and ARF-2531 – the only two grievances "related to claims raised in [his] lawsuit" and pursued through Step III during the relevant period – were both rejected on procedural grounds and therefore unexhausted. (ECF No. 36, PageID.196, 199).  In support of their argument, Defendants submit a Step III summary report, which reflects that Annabel only pursued seven grievances through Step III of the grievance process between the time of the initial incident in September 2019 and his filing of the amended complaint on February 12, 2021.  (ECF No. 36-3, PageID.218-20).  They also submit copies of the salient grievance documents, which confirm that only ARF-2470 and ARF-2531 – in which Annabel grieves that he was forced to work on the Sabbath against his religion and that his requests to switch his workdays were being ignored – are related to the claims raised in the amended complaint.  (ECF No. 36-3, PageID.214-75).[6]

---

[6] The remaining five grievances consist of two alleging retaliatory denial of access to law library materials (*Id.*, PageID.243, 248), one alleging delays in legal mail (*Id.*, PageID.253), one alleging

In response to their motion, Annabel does not dispute the accuracy of the Step III Report, nor Defendants' contention that only ARF-2470 and ARF-2531 are related to the amended complaint.  Instead, he argues that ARF-2470's rejection "at Step I as untimely" was "plainly erroneous" under the deadlines set forth in the Grievance Policy.  (ECF No. 42, PageID.334).  He further asserts that "timeliness was not the final reason for rejection at Step II and Step III appeal of [ARF-2470]" because "Campbell changed the initial erroneous rejection to a non-grievable issue rejection," and that if "this was a non-grievable issue," he "was not required to file a Grievance at all."  (*Id.*).

In reply, Defendants appear to maintain that the First Amendment free exercise and RLUIPA claims were non-grievable, but nonetheless argue that ARF-2470 was also properly rejected as untimely and therefore unexhausted.  Specifically, they argue:

> Although ARF-2470 ***was also rejected at Step II as non-grievable***, that does not change the fact that it was also properly rejected a[t] Step I as untimely.  Because ARF-2470 was untimely filed at Step I, it could not exhaust any claims against MDOC Defendants, ***notwithstanding the fact that the subject matter was also deemed non-grievable***.

(ECF No. 43, PageID.343) (emphasis added).[7]  In other words, Defendants argue that

---

retaliatory termination from his work detail (*Id.*, PageID.258), and one alleging failure to deliver mail (*Id.*, PageID.263) – none of which correspond to the allegations in the amended complaint.

[7] While Defendants' position appears to be that ARF-2470 was properly designated as non-grievable at Steps II and III, it is unclear why Annabel's specific claims concerning First Amendment free exercise and RLUIPA violations would be considered non-grievable under the Grievance Policy.  Defendants make no effort to explain why such claims are non-grievable, and the record does not provide sufficient clarity on this point, given that the Step II Response merely states that ARF-2470 was "Recoded [] as this issue is not grievable due to no violations of policies or procedures."  (ECF No. 36-4, PageID.268).  To the contrary, Annabel argues that ARF-2470 was, in fact, "false[ly] reject[ed]" as a "non-grievable" issue because his claim was grievable as an alleged violation of "Policy Directive 05.03.150, ¶ S," which states that "A Warden may prohibit a religious practice only if it is a threat to the safety, security, and good order of the

Annabel failed to timely exhaust, through the grievance process, an issue which was non-grievable to begin with.  This argument clearly lacks merit.

It is well settled, and common sense, that a prisoner "cannot be required to exhaust administrative remedies regarding non-grievable issues."  *Peoples v. Bauman*, No. 16-2096, 2017 WL 7050280, at *4 (6th Cir. Sept. 5, 2017) (citing *Figel v. Bouchard*, 89 F. App'x 970, 971 (6th Cir. 2004); *see also George v. Whitmer*, No. 20-12579, 2021 WL 2349319, at *5 (E.D. Mich. Apr. 13, 2021), *report and recommendation adopted*, No. 20-12579, 2021 WL 1976314 (E.D. Mich. May 18, 2021); *Reeves v. Hobbs*, 2013 WL 5462147, at *6 (W.D. Ark. Sept. 3, 2013) ("Defendants cannot treat a complaint as non-grievable, and therefore not subject to the grievance procedure, and then turn around and maintain the claim fails because [the plaintiff] failed to follow the grievance procedure.  As the well known proverb states, they cannot have their cake and eat it too.").  Because Defendants in this case expressly state that "the subject matter" at issue in ARF-2470 was "non-grievable," the fact that ARF-2470 was "rejected" at Step I as "untimely" is irrelevant and cannot be a basis for finding that Annabel failed to exhaust the First Amendment free exercise and RLUIPA claims raised in that grievance.  Thus, Defendants' motion for summary judgment for failure to exhaust the First Amendment free exercise and RLUIPA claims should be denied.

---

facility." (ECF No. 18, PageID.134; ECF No. 36-3, PageID.267).  Instead of addressing this point head-on, Defendants appear to broadly maintain that ARF-2470 was properly rejected as both non-grievable and untimely.  (ECF No. 43, PageID.343).  However, as discussed below, Defendants fail to show that they are entitled to summary judgment under either theory.

b.  Defendants Fail to Show that ARF-2470 and ARF-2531 were
Properly Rejected on Procedural Grounds

As discussed above, if Annabel's First Amendment and RLUIPA claims were non-grievable, then ARF-2470 and ARF-2531 did not have to be exhausted through the three-step grievance process at all, so their rejections on procedural grounds cannot establish a failure to properly exhaust administrative remedies.  But even assuming such claims were grievable, Defendants' argument lacks merit because it merely relies on the fact *that* ARF-2470 and ARF-2531 were "rejected," as opposed to a showing that those grievances were "properly rejected." *Johannes*, 2016 WL 1253266, at *6.  And, careful review of the salient grievance documents makes clear that Defendants failed to carry their initial burden at the summary judgment stage to show that ARF-2470 or ARF-2531 were properly rejected in the first place.

First, as for ARF-2470, Defendants assert that the grievance was unexhausted because it was rejected as untimely.  Relevant here, a copy of ARF-2470 reflects that Annabel filed a Step I grievance against Bates about an incident occurring on "10/5/19," during which he was "scheduled [to] work on-ground maintenance" even though he had requested that his "days off (Wednesdays and Thursdays) be switched to Fridays and Saturdays" because he is "forbidden from working" on the "Sabbath."  (ECF No. 36-3, PageID.269).  ARF-2470 lists "10/13/19" under "Today's Date," and "10-15-19" as the "Date Received at Step I."  (*Id.*).

When ARF-2470 was "rejected" as "untimely" by Ream at Step I (*Id.*, PageID.270), Annabel appealed to Step II, arguing in part that "I had 2 business days to resolve and did

15

so on the first <u>business</u> day.  I then had 5 <u>business</u> days to file the grievance.  I had until the end of 10/14/19 to file but did so on Sunday, 10/13/2019." (*Id.*, PageID.267) (emphasis in original).  A Step II response by Campbell states that ARF-2470 was "Recoded from 28E to 27Z as this issue is not grievable due to no violations of policies or procedures. . . . [T]he grievance rejection is upheld at Step II." (*Id.*, PageID.268).  Annabel then appealed to Step III, and Russell "upheld" the rejection.  (*Id.*, PageID.266).

Applying the Grievance Policy's grievance procedures to ARF-2470 makes clear that a material question of fact exists as to whether the grievance was timely filed. Specifically, ARF-2470 lists the date of incident as Saturday, "10/5/19," from which point Annabel had two business days (or until the end of Tuesday, October 8, 2019) to attempt to resolve the matter.  (ECF No. 36-3, PageID.269; Grievance Policy, ¶ Q).  ARF-2470 then reflects that Annabel attempted to resolve the issue with Bates with one day to spare on Monday, "10/7/2019," from which point he had five more business days, or until the end of Monday, October 14, 2019, to file ARF-2470 at Step I.  (*Id.*; Grievance Policy, ¶¶ Q, W).  Thus, as long as Annabel filed ARF-2470 before the end of business day on October 14, 2019, his grievance was timely under the Grievance Policy.

In his response brief, Annabel contends that he filed ARF-2470 on October 13, 2019, which is corroborated by the fact that ARF-2470 lists "Today's Date" as "10/13/19," as well as the fact that Annabel's Step II Appeal states he "had until the end of 10/14/19 to file but ***did so on Sunday, 10/13/2019***." (ECF No. 36-3, PageID.267, 269) (emphasis added).  Moreover, when viewing the evidence and drawing all reasonable inferences in the light most favorable to Annabel, Grievance Policy ¶ W merely instructs that Annabel

16

had to timely "***send***" a completed grievance to "the Step I Grievance Coordinator designated for the facility or other office being grieved," which he apparently did with at least a full day to spare – ***by sending it on "10/13/2019*****.**"  (*Id.*, ¶¶ Q, W) (emphasis added).

Notably, Defendants do not explain how ARF-2470 was untimely, much less dispute Annabel's proffered timeline.  This alone can be construed as a waiver by Defendants of their argument.  However, a review of ARF-2470 suggests that the untimeliness determination may have been premised on the "Date Received at Step I" of "10-15-19" (ECF No. 36-3, PageID.269), based on a provision in the 2019 version[8] of the Grievance Policy stating that grievances are considered "filed ***on the date received*** by the Department" (Grievance Policy, ¶ T) (emphasis added).  Nonetheless, Defendants have not provided any argument disputing Annabel's contention and corroborating evidence that he complied with Grievance Policy ¶ W by sending ARF-2470 on ***October 13, 2019***.  In short, there remains at least a material question of fact as to why there was a two-day delay between the date Annabel ***sent*** ARF-2470 and the date it was marked as ***received***.  (*Id.*, ¶¶ Q, W).  *See Dittmer v. Corizon Health, Inc.*, No. 20-12147, 2021 WL 243009, at *7 (E.D. Mich. 2021) (finding a material question of fact where "Plaintiff's date and signature []
support the inference that he sent [a Step II] appeal on [time]" and thus "would presumably have been 'received' and therefore 'filed' on time," and even if untimely filed, a material

---

[8] Under the 2007 version of the Grievance Policy attached to Defendants' motion, ¶ S states that "Grievances and grievance appeals at all steps shall be considered filed on ***the date sent*** by the grievant."  (ECF No. 36-2, PageID.210, ¶ S) (emphasis added).  Based on that outdated version, there would be no dispute that ARF-2470 was timely based on the listed sent date of "10/13/19" under "Today's Date."  (ECF No. 36-3, PageID.269).

question as to "whether the delay between [the date sent] and [date received] should have been excused").   Accordingly, Defendants failed to carry their initial burden at the summary judgment stage to show that ARF-2470 was untimely.

Second, as for ARF-2531, Defendants assert that the grievance was unexhausted because it was rejected as a duplicate of ARF-2470.[9]  But again, the Court rejects the illogical position that "whenever a grievance is rejected as duplicative, it is not properly exhausted as a matter of law."  *See Johannes*, 2016 WL 1253266, at *6.  Rather, "to carry their summary-judgment burden, Defendants must compare the issues grieved in the first grievance to those grieved in the [] allegedly-duplicate grievances and show that every reasonable jury would think the rejections were proper."  *Id*.  Defendants fall far short of that standard here.  Indeed, ARF-2531 and ARF-2470 are not "duplicates" of each other.

Relevant here, a copy of ARF-2531 reflects that Annabel filed a Step I grievance against Bates ***and Messer***, complaining that he was scheduled to work on-ground maintenance on "***10/19/19***," even though he was "forbidden from working" on the Sabbath based on his religion, and that his request to switch his off days was ignored.  (ECF No. 36-3, PageID.274) (emphasis added).  Ream "rejected" ARF-2531 at Step I as a "Duplicate of [ARF-2470]."  (*Id.*, PageID.275).  Annabel then appealed to Step II, stating that "[t]he date of incident in [ARF-2470] was 10/5/2019 but this incident was 10/19/2019, a separate

---

[9] As discussed above with ARF-2470, under Defendants' position that the First Amendment free exercise and RLUIPA claims were non-grievable, Annabel would not be required to exhaust such claims in ARF-2531 through the three-step grievance process in the first place, so its rejection at Step I as a "duplicate" cannot be a basis for finding that he failed to exhaust the claims raised in that grievance.

incident [].” (*Id.*, PageID.272).  Campbell upheld the rejection at Step II, and Russell upheld the rejection at Step III.  (*Id.*, PageID.271, 273).

Although ARF-2531 relates to the same general subject matter as ARF-2470 – that he was forced to work on the Sabbath and his requests to exchange workdays were ignored – ARF-2531 concerns an incident occurring on a different date (October 19, 2019 as opposed to October 5, 2019), and involves an additional individual in Messer (as opposed to solely Bates).  Defendants do not make any arguments to the contrary, and because they fail to make any showing that ARF-2531 was a “duplicate” of ARF-2470, they cannot now use this improper rejection to claim that Annabel failed to exhaust his administrative remedies against them.  *See Burnett v. Walsh*, No. 18-11063, 2020 WL 3716555, at *4-5 (E.D. Mich. June 15, 2020), *report and recommendation adopted*, No. 18-11063, 2020 WL 3639564 (E.D. Mich. July 6, 2020).  Accordingly, Defendants also failed to carry their summary judgment burden to show that ARF-2531 was duplicative.

### 2. *Failure to Exhaust Remaining Grievable Claims*

Though Defendants failed to show their entitlement to summary judgment on the First Amendment free exercise and RLUIPA claims, Annabel’s amended complaint also raises First Amendment retaliation claims and claims asserting that the sanctions he received under the Discipline Policy violated his rights under the First Amendment, Eighth Amendment, Fourteenth Amendment, and ADA.  Defendants do not specifically address these claims, and instead broadly argue that Annabel failed to exhaust any “remaining claims.”  After careful review, the Court agrees that Annabel failed to exhaust these remaining grievable claims through the three-step grievance process.

a.  Claims of First Amendment Retaliation

In his response brief, Annabel argues that he "clearly named [] Bates in his Step I grievance [in ARF-2470] but was not aware of the involvement of [] Ream, Evers, Messer[], Campbell, and Russell until after he had filed the Step I," and that "[a]t Step II he clearly named Ream, Evers, Messer[], and Campbell but Russell was not involved until after the Step III appeal was filed."  (ECF No. 42, PageID.335).  To the extent he suggests that his naming of Ream, Evers, Campbell and/or Russell at Steps II or III exhausted his retaliation claims against them, such an assertion is misguided.

Relevant here, Grievance Policy ¶ S provides that the "names of all those involved in the issue being grieved are to be included" when filing a "Step I grievance."  (Grievance Policy, ¶ S).  Looking at ARF-2470 and ARF-2531, it is undisputed that Annabel failed to name any defendants other than Bates and Messer, let alone allege any issue of retaliatory misconduct, at Step I of those grievances, which were rejected through all three steps on procedural grounds.  Thus, the fact that Annabel subsequently named certain defendants in his Step II and III appeals is inadequate for proper exhaustion of new retaliation claims against those defendants, as the Grievance Policy required him to "name all those involved in the issue being grieved" at Step I.  (Grievance Policy, ¶ S); *see Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) ("Under the Department of Corrections' procedural rules, inmates must include the '[] names of all those involved in the issue being grieved' ***in their initial grievance***.") (emphasis added); *Brown v. McCullick*, No.18-2226, 2019 WL 5436159, at *3 (6th Cir. 2019) (rejecting plaintiff's argument that "he named some of the defendants at step III of the grievance process" where he failed to name them "at step I of

20

this grievance, [and thus] failed to exhaust his claims against them.").  The same applies to Annabel's retaliation claims against Houser and Thomas, who were not named at all.

While Annabel argues that he was "not aware" of certain defendants' retaliatory acts against First Amendment protected conduct until he received "false rejections" at Steps II and/or III, that is irrelevant as he was required to timely file a separate Step I grievance raising retaliation claims upon discovery of these alleged acts and specifically naming the individuals involved, as a violation of the Grievance Policy.  (*See* Grievance Policy, ¶ K ("A grievant shall not be penalized in any way for filing a grievance . . . .  Staff shall avoid any action that gives the appearance of reprisal for using the grievance process.").  Because Annabel failed to do so, Defendants are entitled to summary judgment on these retaliation claims.

b.  Claims regarding the Discipline Policy

In his amended complaint, Annabel also raises First Amendment, Eighth Amendment, Fourteenth Amendment, and ADA challenges based on the sanctions he received under the Discipline Policy as a result of his "Insolence" misconduct charge. (ECF No. 18, PageID.137-39).  Defendants seek summary judgment on a broad argument that "Annabel did not properly exhaust any grievable claims against MDOC Defendants." (ECF No. 36, PageID.199).  Defendants attach to their motion a copy of the Discipline Policy (ECF No. 36-6, PageID.292-312), and careful review of this policy makes clear that Annabel failed to exhaust these grievable claims.

First, Annabel alleges First Amendment free speech and Fourteenth Amendment due process violations against Washington.  (ECF No. 18, PageID.137).  Relevant here,

the Discipline Policy defines "Class II Misconducts" to include an act of "Insolence," which is defined as "Words, actions, or other behavior which is intended to harass, degrade, or cause alarm in an employee."  (ECF No. 36-6, PageID.308 (Attachment B)).  The Discipline Policy then lists "Common Examples" as "Using abusive language to refer to an employee; writing about or gesturing to an employee in a derogatory manner."  (*Id.*). Under the Discipline Policy, "Sanctions for Class II Misconduct" include "Loss of privileges, not to exceed 30 days for all violations arising from a single incident," which may preclude a prisoner from engaging in certain activities, such as use of the activity room, exercise facilities, kitchen area, visitations, etc.  (*Id.*, PageID.311 (Attachment D), PageID.312 (Attachment E)).

Based on the above provisions, Annabel asserts that the Discipline Policy is "overbroad" because "the 'Insolence' rule includes protected conduct" like "saying employees are corrupt," but also "vague" because he contends that it "failed to give him reasonable notice that complaining that an employee was 'a very corrupt defendant' constituted 'Insolence.'"  (ECF No. 18, PageID.137).  It is undisputed, however, that Annabel did not pursue any grievance through Step III during the relevant period that raised such challenges to the Discipline Policy.  (ECF No. 18, PageID.135).  Thus, the issue boils down to whether his First and Fourteenth Amendment claims were grievable under the Grievance Policy's provision that "[p]risoners and parolees are required to file grievances" unless "[t]he prisoner is grieving <u>content</u> of the policy or procedure ***except as it was specifically applied to the grievant.***"  (Grievance Policy, ¶ J(8))(emphasis added).

Even liberally construed, a fair reading of Annabel's operative amended complaint

leads to the conclusion that his claims are as-applied challenges to the Discipline Policy, which were grievable under the Grievance Policy.  (Grievance Policy, ¶ J(8); *see* ECF No. 18, PageID.136 (alleging in the amended complaint that he "had a constitutional right to criticize Ream for being a 'very corrupt defendant' and that the policy was vague and overbroad ***as applied***") (emphasis added)); *see George*, No. 20-12579, 2021 WL 2349319, at *5 ("Complaints about the 'content of a policy or procedure' are nongrievable under MDOC rules unless a prisoner is challenging how the policy was specifically applied to him.").  Indeed, the gravamen of his claims is that the Discipline Policy allowed for him to be sanctioned for engaging in a specific instance of protected conduct – calling Ream a "very corrupt defendant" – without being given notice that such conduct was sanctionable as an act of "Insolence."  *See Beebe v. Birkett,* 749 F. Supp. 2d 580, 587 (E.D. Mich. 2010) ("In an as-applied challenge, 'the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional.'" (citing *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 194 (6th Cir. 1997)).  His requested relief is also informative, as he does not seek to void the Discipline Policy or any of its provisions, but instead seeks to specifically "expunge the 'Insolence' charge" and to remove/waive the sanctions resulting from that specific charge. (ECF No. 18, PageID.139-40).  Thus, Annabel raises an as-applied challenge to the Discipline Policy, and he was required to pursue a grievance through Step III.  Because he failed to do so, his First and Fourteenth Amendment claims regarding the Discipline Policy should be dismissed.

Second, as to his related ADA claim, Annabel alleges that the sanctions he received

under the Discipline Policy "aggr[a]vat[ed] [his] pre-existing mental illness," and has "subject[ed]" him to "loss of privileges" without any "relief for good behavior or mental illness considerations or mitigation of past behavior from [prior] inadequate mental health treatment." (*Id.*, PageID.138-39).  While his ADA claim is difficult to decipher, a liberal construction suggests that he faults Washington and Campbell for "refus[ing] to accommodate [him] with a sanctions waiver," despite the fact that his "mental illness behavioral issues" generally subject him to more discipline, and/or for failing to provide "[loss of privileges] waivers" even though his mental illness makes him "more vulnerable to suffer mental health issues from severe restrictions and isolation." (ECF No. 18, PageID.138-39).  However, such claims are covered under the Discipline Policy and were therefore subject to the grievance process.

Specifically, a refusal or failure to provide sanction waivers is grievable as an alleged violation of Discipline Policy ¶ RRR, which provides, "The Warden may waive all or any part of a sanction period that has not been served by a prisoner.  If the prisoner is being reclassified to general population, including for placement in any Residential Mental Health Treatment program, all of the remaining detention sanction must be waived; it cannot be waived in part." (ECF No. 36-6, PageID.302, ¶ RRR).  Thus, to the extent Annabel faults Campbell for refusing or failing to waive sanctions related to his "Insolence" charge despite the fact that a waiver was warranted due to his mental illness, such claim was grievable as a violation of the Discipline Policy.

Moreover, to the extent he generally takes issue with how the Discipline Policy was applied to him as a prisoner with a mental illness, this was also grievable under Grievance

Policy ¶ J(8).  *See George*, 2021 WL 2349319, at *5 (stating that a challenge to "how the policy was specifically applied to [a prisoner]" is grievable).  Indeed, the Discipline Policy contains a specific section titled "Special Provisions for Prisoners with a Mental Disability," which accounts for disciplinary procedures concerning prisoners with various mental illnesses.  (ECF No. 36-6, PageID.300).  For instance, the Discipline Policy provides that "[a] prisoner with a mental disability is not responsible for misconduct if s/he lacks substantial capacity to know the wrongfulness of his/her conduct or is unable to conform his/her conduct to Department rules as a result of the mental disability," including "Mental illness."  (*Id.*, PageID.300, ¶ DDD).  Moreover, "[i]f a prisoner [] raises the issue that the prisoner may not be responsible for the misconduct due to mental disability, a request for a responsibility determination shall be directed to the Outpatient Mental Health Team if the prisoner is on their caseload or to a QMHP."  (*Id.* at ¶ EEE).  "If the prisoner is determined to be not responsible for his/her behavior due to his/her mental disability, the Class I or Class II Misconduct Report shall not be processed," and even "[i]f the prisoner is believed to be responsible for his/her behavior," the "misconduct shall not be processed" if it is determined to be "detrimental to the prisoner's mental health treatment needs." (*Id.* at ¶ HHH).

The above provisions make clear that, to the extent Annabel was determined to be mentally disabled, he could not be held responsible for conduct "due to mental disability [or illness]," nor receive sanctions that were "detrimental to [his] mental health treatment needs."  (*Id.* at ¶¶ DDD, HHH).  Thus, Annabel's broad claims that he was sanctioned despite his mental illness or that certain sanctions aggravated his mental illness were

grievable as violations of the "Special Provisions for Prisoners with a Mental Disability" outlined in the Discipline Policy.  Because it is undisputed that Annabel failed to pursue any such grievances through Step III during the relevant period, his ADA claim regarding the Discipline Policy should be dismissed as unexhausted.

Finally, a similar analysis applies to Annabel's Eighth Amendment claim that "Washington and Campbell have subjected Plaintiff to cruel and unusual punishment by refusing to authorize a waiver of the loss of privileges sanctions . . . despite a period of nearly a year without misconduct (only the retaliatory 'Insolence' charge)." (ECF No. 18, PageID.137-38).  As discussed above, his claim regarding a "refusal" to waive sanctions was grievable as a failure to apply sanction waivers warranted under Discipline Policy ¶ RRR (ECF No. 36-6, PageID.302, ¶ RRR), and Annabel's claims that certain sanctions caused "aggr[a]vation of pre-existing mental illness" due to "severe social isolation" and lack of "out-of-cell exercises" were grievable as violations of Discipline Policy ¶ HHH, which prevents the processing of sanctions that are determined to be "detrimental to the prisoner's mental health treatment needs."  (*Id.* at ¶ HHH).  Because Annabel failed to pursue any grievances bearing on these grievable issues during the relevant period, his Eighth Amendment claim regarding the Discipline Policy is unexhausted and should be dismissed.

### 3.   *Failure to State a Claim against Russell*

Finally, Defendants alternatively seek dismissal of claims against Russell on the basis that "Annabel's conclusory allegations [] simply do not state a claim" because he failed to allege that "Russell [was] personally involved in the ARF incidents which form

the basis of this lawsuit." (ECF No. 36, PageID.203). Annabel responds that "Russell was directly involved in the unconstitutional decision to force Plaintiff to work or accept wages on the Sabbath days of rest when he approved and implicitly authorized those actions to continue by deeming them as a non-grievable issue." (ECF No. 42, PageID.335).

It is well established in the Sixth Circuit that the "mere denial of a prisoner's grievance states no claim of constitutional dimension." *Alder v. Corr. Med. Servs.*, 73 F. App'x 839, 841 (6th Cir. 2003); *see also Mitchell v. Caruso*, No. 09-11467, 2010 WL 727742, at *4 (E.D. Mich. 2010) ("[a] defendant is not liable under § 1983 when his or her only action was to deny an administrative grievance." (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Here, Annabel's only allegation against Russell is that he "upheld the malicious rejection that the issue was non-grievable and that Plaintiff had no religious rights," which fails to allege any personal involvement in an alleged violation of his religious beliefs. (ECF No. 18, PageID.134). *See, e.g., Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) (the "'denial of administrative grievances or the failure to act by prison officials does not subject supervisors to liability under § 1983.'"); *Simpson v. Overton*, 79 F. App'x 117, 120 (6th Cir. 2003) ("[T]he denial of an appeal cannot in itself constitute sufficient personal involvement to state a claim for a constitutional violation."). Thus, Annabel's claims against Russell should be dismissed.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Partial Summary Judgment on the Basis of Exhaustion **(ECF No. 36)** be **GRANTED IN PART AND DENIED IN PART** as discussed above. Assuming this recommendation

27

is adopted, Annabel's remaining claims will include only his First Amendment free exercise and RLUIPA claims, and his claim of a retaliatory misconduct ticket against Ream.

Dated: January 4, 2022                        s/David R. Grand
Ann Arbor, Michigan                           DAVID R. GRAND
                                              United States Magistrate Judge

## **NOTICE TO THE PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.  A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

  The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 4, 2022.

s/Eddrey O. Butts   
EDDREY O. BUTTS
Case Manager
